PEOPLE *v*. RUSSELL

1. CRIMINAL LAW—PLEA OF GUILTY—COMPETENCY—DUTY OF COURT.
   A sentencing judge has an inescapable duty to inquire into a defendant's mental responsibility for the crime charged and his mental competency to waive trial and plead guilty or to stand trial.

---

REFERENCES FOR POINTS IN HEADNOTES

[1–6] 21 Am Jur 2d, Criminal Law §§ 64, 486.
 Investigation of present sanity to determine whether accused should be put, or continue, on trial. 142 ALR 961.
[6] Plea of guilty without advice of counsel. 149 ALR 1403.
[7–9] 21 Am Jur 2d, Criminal Law § 317.

2. Criminal Law—Constitutional Rights—Waiver—Competency —Duty of Court.

Information coming to the court's attention which raises a "bona fide doubt" of a criminal defendant's competency to waive his constitutional rights requires that the judge conduct a due process hearing to determine mental competency and make appropriate findings from the hearing (GCR 1963, 785).

3. Criminal Law—Competency—Reports—Bona Fide Doubt.

A presentence report on a defendant who had pleaded guilty to a charge of rape, in which it was suggested that defendant committed the crime "on impulse", thus raising the possibility of an insanity defense of irresistible impulse, and a psychiatrist's affidavit suggesting that defendant's plea of guilty was a predictable, automatic taking of the easy way out without real choice on his part, were sufficient to raise a bona fide doubt of defendant's competency to waive his constitutional rights and plead guilty.

4. Criminal Law—Competency—Demeanor.

A hearing to determine a defendant's competency may not be dispensed with merely because the defendant's demeanor at trial fails to reveal any apparent abnormality after the issue of competency has been raised.

5. Criminal Law—Defenses—Insanity—Irresistible Impulse— Criminal Responsibility.

A showing that an accused may have responded to an "irresistible impulse" is relevant in determining criminal responsibility.

6. Criminal Law—Plea of Guilty—Competency.

Acceptance of a plea of guilty of rape from 18-year-old defendant, without assistance of counsel, who was unaware that he may have had a valid insanity defense of irresistible impulse, was erroneous where psychiatric reports presented to the court strongly indicated that defendant was incompetent to enter a valid guilty plea (MCLA § 750.520).

7. Criminal Law—Competency—Assistance of Counsel—Waiver —Plea of Guilty.

An incompetent defendant must have the assistance of counsel to tender the issue of his incompetency at trial, and it is error to allow him to waive assistance of counsel and plead guilty when there are indications of incompetence.

8. CRIMINAL LAW—COMPETENCY—DUTY OF COURT.

> Indications that an accused is possibly mentally incompetent require increased attention from the trial judge who has the duty of protecting the accused's constitutional rights and that duty may not be discharged by taking "yes" and "no" answers to formal questions.

9. CRIMINAL LAW—ASSISTANCE OF COUNSEL—WAIVER—VALIDITY— INSANITY—DEFENSES.

> Waiver of the right to counsel is valid only when the defendant has an apprehension of the nature of the charge, the included statutory offenses, the range of allowable punishments, possible defenses, mitigating circumstances and all other facts essential to a broad understanding of the entire matter, and where because of the legal complexity of a possible defense of insanity the defendant's rights cannot be fairly protected without the assistance of counsel, his right to counsel cannot be deemed to have been intelligently and voluntarily waived.

Appeal from Charlevoix, Charles L. Brown, J. Submitted Division 3 May 8, 1969, at Grand Rapids. (Docket No. 6,274.)   Decided October 30, 1969.

Wayne Russell was convicted, on his plea of guilty, of rape.   Defendant appeals.   Reversed and remanded for rearraignment.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General and *Harvey C. Varnum,* Assistant Prosecuting Attorney, for the people.

*Lawrence W. Rattner,* for defendant.

Before: J. H. GILLIS, P. J., and R. B. BURNS and BRENNAN, JJ.

J. H. GILLIS, P. J.   Defendant, upon his plea of guilty, was convicted of rape.*   At the time, defendant was 18 years old, with no prior criminal record.

---

* MCLA § 750.520 (Stat Ann 1954 Rev § 28.788).

The offense took place in the early morning of September 19, 1967, and defendant, after waiving examination, was arraigned two days later in the Charlevoix county circuit court. At the arraignment, defendant waived his right to jury trial and stated that he wished to plead guilty. The court then made the following inquiry:

"*The Court:* You want to plead guilty?
"*Defendant:* Yes.
. "*The Court:* I want you to know you have those rights. And you have a right to a lawyer and if you don't have the funds to hire a lawyer and want a lawyer, it would be the duty of the court to furnish a lawyer to you at no expense to you, but at county expense. I take it from what you have indicated that you do not wish to have a lawyer?
. "*Defendant:* No; I don't.
"*The Court:* And you say you desire to plead guilty?
"*Defendant:* Yes, sir.
"*The Court:* You thoroughly understand the nature of the offense, do you?
"*Defendant:* Yes, sir.
"*The Court:* In pleading guilty has anyone used any force, threats or influence of any kind against you, or made any promises of any kind to you, in order to have you say you are guilty?
"*Defendant:* No, sir.
"*The Court:* You are pleading guilty then simply because you are guilty, and for no other reason?
"*Defendant:* Yes, sir.
. "*The Court:* I don't know a thing about this, other than what I have just heard today. You don't have to go into all the details, but I wonder if you can indicate to me whether it was in a car, or in a house, or where it was?
"*Defendant:* In her house, sir.
: "*The Court:* Is it true that she did not consent?
"*Defendant:* Yes, sir.

"*The Court:* And you had to use some force?

"*Defendant:* Yes, sir.

"*The Court:* What kind of force did you have to use?

"*Defendant:* What do you mean?

"*The Court:* Did you have to hold her arms, or hold her throat, or how did you force her? Did you have to threaten her in any way?

"*Defendant:* I don't clearly remember, sir.

"*The Court:* Did you beat her up, or anything?

"*Defendant:* No, sir.

"*The Court:* Did you choke her, or anything?

"*Defendant:* I don't know, sir.

"*The Court:* But you remember enough to know whether you used some force?

"*Defendant:* Yes. I believe I did.

"*The Court:* So you feel you actually are guilty?

"*Defendant:* Yes, sir.

"*The Court:* Very well. The court will accept your plea, and refer you to Mr. Sweet [Probation Officer]. Tell him all you can about it, and after I get his report we will try and do the fair thing.

"*Mr. Varnum* [*Prosecuting Attorney*]: Your Honor, I have had some contact indirectly through an attorney, who is not representing this man as such, but on behalf of his grandmother, and he has given me some background as to the early years of the accused's life, and in view of the severity of this crime and the penalty that can be meted out, both myself and the probation officer felt that in the event a plea of guilty was made, and accepted by this court—which has now actually transpired—that it might be very advisable that this man have a psychiatric evaluation at the Traverse City State Hospital Out-Patient Department, as part of the pre-sentence investigation. I would ask that the court make this a requirement in this pre-sentence investigation.

"*The Court:* Very well. That may be done. And I confirm what you have stated. A telephone call was made to Dr. Nickels of the hospital staff today,

to see if an appointment could be arranged, and he has indicated this may be arranged, and he has indicated this may be arranged in about thirty days, and that they would perform such tests. So that may be done. The same bond may be continued."

On December 8, 1967, defendant appeared for sentencing. The trial court then had before it the report of Dr. R. E. Pearson of Traverse City State Hospital. The report, substantially in its entirety, reads as follows:

"Present Illness:

"The following is the patient's version of the events which led to his arrest and referral to this clinic: He states that at approximately 1 a.m. on September 19, 1967, he was out driving by himself, with nothing particularly on his mind as to plans for the rest of the night. As he was driving along he happened to notice an acquaintance of his leaving this acquaintance's fiancee's home. The patient parked his car about a quarter of a mile away, and walked back to the house of this girl. He says that he knew she lived alone, had probably gone to bed, and that she would think it very unusual for him to come to the door, because the patient and this girl were only very casual acquaintances. He says that he knocked on the door, and when she answered it he told her that her fiance had been in an accident, and needed her right away. She allowed the patient to enter the house at that point. He says that he immediately made advances to her, tearing at her two-piece pajamas, removing the pajama pants, and then forcibly raping her. He states that she did not scratch or bite him, but only cried and screamed in an attempt to get help. When asked why she did not scratch or bite him, he replied, 'I guess I told her I would kill her if she didn't do like I wanted her to.' With only some reluctance does this patient describe the intimate physical details of the rape. He says that he forced her onto the bed, tore her

pajama pants off, forcibly spread her legs, and with a good deal of force inserted his penis in her vagina. When asked how the girl reacted in this point, he replied, 'I guess she was still trying to get away, but I weigh twice as much as she does, and her moving around made me all excited.'

"After ejaculating the patient allowed the girl to get off the bed, and attempted to make her promise that she would not call her boyfriend or the police. He says that he 'thinks' he threatened to kill her if she ever told anybody. At this point an attempt was made by me to evaluate his remembrance of his feelings at that time, and the patient states that he was afraid and disgusted: afraid that he would be caught and sent to jail, and disgusted that he would allow himself to get into a position where he would obviously get in trouble with the police.

"The patient describes his victim as very small, weighing about 100 pounds, and being about 20 years old. He says he has no knowledge that she was not a virgin until that night, but that he had presumed that she was not a virgin on the assumption she was having intercourse with her fiance. When asked to elaborate on this, he could only generalize that, 'All engaged people do it.'

"After spending 15 to 20 minutes attempting to persuade the girl not to report it to the police, the patient drove home to his wife and says he slept the rest of the night. At work the next day he was arrested and then released on $250 cash bond. The patient states that he has been told that he could be sent to prison for the rest of his life for this offense, and that he feels this is too great a punishment for the offense. The patient states that he did plead guilty to the charge of rape.

"When the patient was asked what he thought about the subject of rape and rapists, he could only say, 'I guess it's a bad thing.' When asked if he thinks he may have damaged his victim, he could only say, 'I just bruised her a little bit, and they will heal,' Questions concerning possible psychological

damage to the victim of a rapist seemed to be not comprehended by this patient.

"The patient states that he remembers the details of what happened that night, and it is my impression that he recounted some of the details with some relish. There seemed to be absolutely no evidence of any feelings of guilt as a result of his recent behavior.

"Past History:

"The patient states that his father's name is Ralph Wiltse, whom he thinks lives on a farm near Ellsworth. He has never had any contact with his father other than having him pointed out. The patient says that he was the illegitimate son of this man and his mother named Juanita Russell, when his mother was seventeen years old. Some time after his birth his mother married another man, and had another child. When the patient was about four he says that he has been told, although he does not really remember it, that his mother was shot to death by her husband in his presence. The patient has also been told by relatives that he threatened to kill his stepfather after this. This stepfather later married again, and then shot and killed both himself and his wife. After his mother's death the patient lived with his stepfather's parents for approximately one year, and then was made a ward of the court, and lived with his mother's parents. There was one other child in the house, a boy four years older than the patient, but their actual relationship is unclear. The patient was raised by his maternal grandparents until he left home to be married.

"The patient was born in Charlevoix, Michigan, on April 4, 1949. As far as is known to the patient his birth and early development were normal. He began school at the age of five, and says that he received excellent marks until the tenth grade, when he rather suddenly began receiving poor marks, which he attributed to laziness. He also relates that at this time he became involved with the woman who is now his wife. The patient claims to have had

a normal childhood, with the usual amount of friends and acquaintances. He admits he began masturbating at the age of twelve, and soon indulged himself seven to ten times a week. Sex education was obtained from peers only. When he was fifteen years old he started dating the girl who is now his wife. While he was still fifteen years old they began having intercourse several times a week, and he began living in her home. They were married on March 14, 1966, the patient at that time being sixteen years old, and his wife being nineteen and seven months pregnant. His wife graduated from high school in Boyne City, Michigan, and attended part of one year of college. The patient states that his sexual relations with his wife is [*sic*] very good, enjoyable to both, and that they have intercourse three to four times a week. The frequency of intercourse has not lessened since the patient's arrest. Apparently the patient's wife has expressed no opinion to the patient about the rape, and seems to be continuing her relationship with him as if nothing had happened. The patient also states that neither of his grandparents has expressed an opinion. Since his arrest the patient, his wife and child, have been living with his grandparents. He cannot characterize these grandparents except to say that they are 'nice people.'

"The patient has had a large number of jobs considering his age, and is presently employed in Charlevoix, driving a concrete truck. He says that there was much publicity, including newspaper articles, over his trouble with the law, but that his boss and friends have not mentioned his difficulty, and he has continued to work and socialize as before. He says that he and his wife are quite deeply in debt, but that, 'Things will work themselves out.'

"The patient has had no military service. He apparently smokes and drinks moderately, and has had no previous trouble with the law.

"Mental Status:

"The patient is a tall, nice-appearing young man

looking approximately his stated age although he could easily pass for being several years older than eighteen. He is appropriately and neatly dressed. Posture, facial expression, motor activity, etc., are not remarkable. There is no particular pressure of speech, and reaction to the interview gave the impression that there was nothing unusual about his situation. There were moderate amounts of anxiety present, but these seemed to be related only to his current problems with the law, and did not seem to be related to his behavior. There were no abnormal fluctuations of mood or affect. No evidence of bizarre thought content, preoccupation (except his current status with the law), obsessions, compulsions, somatic complaints, doubts, indecisions, guilt, or phobias could be elicited. The patient denies feelings of unreality or depersonalization. There is no evidence of delusions, perceptual distortions, hallucinations, ideas of reference, paranoia or grandiosity.

"The patient is correctly oriented in all three spheres. Recent and remote memory are intact. Attention and recall, as measured by digit span, are within the range of normal. Serial sevens were subtracted accurately and rapidly. Calculations were done almost instantaneously. General fund of information is high, and intelligence is estimated at bright normal or above. Vocabulary, both concerning use and understanding, is excellent. Abstract reasoning, as tested by proverbs and similarities, is done at a very high level. Anxiety level is moderate, and as stated above, seems to be related only to his present difficulty, and a desire to perform well during this evaluation. Stress tolerance is good. Prominent defense mechanisms are repression and denial. There seems to be no insight, and no motivation for change. The patient verbalizes some confusion concerning why he raped his victim, but it is my impression that this confusion is verbal only.

"Diagnostic Synthesis:

"This patient was not born into a poor family: he was born into no family at all. He has known he was illegitimate since a very early age, and in spite of his denial of a memory of it, actually witnessed his mother's murder at the hands of his stepfather. His rage, frustration, and confusion at this age are easy to imagine. He was raised by his maternal grandparents, who obviously could not provide him with either a father figure or mother figure toward which he could orient himself normally. He apparently was forced to restrain himself and not allowed to vent his rage and frustrations on the world, and of course, grew older without being able to understand normal human relationships. This man obviously has never learned the meaning of the word love beyond its sexual implications. Neither has he had an opportunity to learn other essential human feelings, notably a sense of guilt.

"Part of his misfortune was that he matured physically earlier than most, and at fifteen established a sexual relationship with a girl three years his senior. Apparently for some time this woman was able to meet his sexual needs, and he refrained from violence upon her person. In view of this background it is not surprising, after all the years of repression and frustration, that this patient 'on impulse' took the opportunity to violate a woman in the manner that he did. I would speculate that his rape victim did a very intelligent thing by not resisting him with more violence, because it is certainly possible that if she had fought too hard, he might have followed up his threat by actually killing her.

"Tentative Diagnosis:

"Sociopathic personality disturbance, sexual deviation, with features of very strong hostility.

"Prognosis:

"Poor."

Before passing sentence, the trial court engaged in the following colloquy with defendant:

"*The Court:* I have a report here from the doctors. They gave you a lot of tests, didn't they?

"*Defendant:* Yes, sir.

"*The Court:* They don't say that they can help. This wasn't fair to your wife, was it?

"*Defendant:* No.

"*The Court:* You were getting along fine at home. There wasn't any reason for you to go out and do this, was there?

"*Defendant:* No.

\* \* \*

"*The Court:* This is a difficult case. Frankly, I don't remember—certainly not for a number of years —of having any more deliberate case of forcible rape than this one. You go up to the house after you had seen her fiance leave and tell her that he has been in an accident, and when she panicked and let you into the house you immediately began to force her and actually forcibly raped her. You don't really have any excuse for it, do you?

"*Defendant:* No, sir.

\* \* \*

"*The Court:* The thing that bothers me, as well as others, you perhaps by nature are not very expressive, but certainly you don't exhibit any remorse. Maybe that is just your nature. I realize the kind of a life you have had since you were born. I have a very thorough, comprehensive, detailed historical report, so I know quite a bit about you. I know if you had a sister you would feel like shooting somebody that did to your sister what you did to this young woman. No matter what I do, I can't repair the damage.

"I am going to have to pass sentence, and I am going to explain it to you and make some recommendations, and also make some promises, or statements. This is not going to be, probably, as bad as it sounds originally. As I mentioned before, I can-

not find a reason for it: you cannot give me a reason for it. Something has to be done to try and discourage others from doing it.

"So, it is the sentence of this court that you be confined in Southern Michigan branch of the Corrections Commission at Jackson for a period of not less than 12-1/2 years, or more than 25 years.

"However, I am recommending that just as soon as possible the doctors in the institution go over this report from the doctors here; that they also make their own independent examination, and see if they can find anything different than the doctors here were able to find; and if they feel at any time, even if it is immediately following their examination, that you should be sent to a hospital, this is my unconditional authority for them to do that, without even writing me a letter or consulting me. They wouldn't have to, anyway; but I want them to understand that I feel this is serious enough that they should go over this. Because, if you ought not to be there, then you need some help, and you should be in a proper place to get that help.

"I will say this, further: if they at any time feel that you are safe to be released, and should be released, and they recommend special consideration for early parole, I will be the last one to stand in the way of it. I have never failed to cooperate as yet, because I feel if they determine you should be released earlier, I certainly shouldn't object to it."

On December 28, 1967, defendant, after retaining counsel, filed separate motions to withdraw his plea of guilty and for a new trial. He alleged therein that the record revealed that he was not mentally responsible for the offense and that under the circumstances the trial court, in the interests of justice, should have appointed counsel for him and refused to accept his plea. He further alleged that he was not competent to waive his constitutional rights and plead to the charge against him.

In support thereof, defendant submitted an affidavit of Dr. Daniel Goudelock, a psychiatrist. Dr. Goudelock had interviewed defendant on three different occasions and had also interviewed his wife and his grandparents with whom he had lived. In the affidavit, defendant's condition was analyzed in terms of a "repetition compulsion," *i.e.*, "a person's reaction to stress can be predicted with a reasonable degree of accuracy if one knows how that person has reacted to stress on other occasions. An important element in considering 'repetition compulsion' is that this mechanism is dictated by the unconscious part of the mind and is not under the voluntary control of the individual. This mechanism is automatically set in motion by predetermined psychological conditions which act to trigger the automatic, stereotyped response in the individual." Referring to defendant's witnessing the killing of his mother by his stepfather in his presence, Dr. Goudelock stated that this "would leave him with this indelible imprint of the consequences of harboring angry or hostile feelings against one in authority and render him markedly passive in any such relationships in the future." As for the frequent and prolonged tongue-lashings inflicted upon defendant by his grandparents, "because of the lessons he had previously been taught in similar relationships to those in authority, he was in effect left defenseless in these encounters." Dr. Goudelock further stated that

"in applying his past emotional development and his past responses to people in authority, to the circumstances surrounding his arrest, arraignment, and sentencing in September and December of 1967, the following projections can reasonably be made:

"(1) His prevailing state of mind was fear of those in authority.

"(2) This fear led him to agree to whatever those authorities suggested or implied.

"(3) He would take the path of least resistance, *i.e.*, refuse counsel and jury trial in order to end the proceedings and remove himself from the stress of the court as quickly as possible.

"Therefore, we must conclude that his plea of guilty, his waiver of his right to examine his accuser, his refusal of counsel and of trial by jury were all decisions he was not emotionally competent to make. On the contrary, these decisions were automatic and predetermined by his emotional make-up and not arrived at by rational and intelligent consideration. He, in fact, had no choice in the decisions. They were made automatically by the unconscious part of his mind over which he had no control."

The trial court denied defendant's motions and this appeal followed.

Defendant addresses himself primarily to the issue of his mental competency at the time of arraignment.

"We are all indeed aware of the sentencing judge's inescapable duty to make appropriate inquiry concerning the mental responsibility of an accused for the offense charged and the mental competency to waive and plead or to stand trial on the charges against him. * * *

"The latest word on the scope of the court's duty to hear and decide mental competency to waive and plead or stand trial is *Pate* v. *Robinson* (1966) 383 US 375 (86 S Ct 836, 15 L Ed 2d 815). That case * * * articulated the standards by which a sentencing judge shall be guided in the discharge of his highly sensitive presentence responsibilities. It is there said that if any information coming to the attention of the court raises a 'bona fide doubt' of the defendant's competency to waive his constitutional rights and plead or to stand trial, it then becomes the inescapable duty of the court to conduct a due process hearing to determine mental competency and to make appropriate findings thereon."

*Wolcott* v. *United States* (CA10, 1969), 407 F2d
1149, 1150, 1151. See MCLA § 767.27a [Stat Ann
1969 Cum Supp § 28.966(11)], GCR 1963, 785.

We are inclined to state that the presentence
report and the affidavit of Dr. Goudelock raised a
"bona fide doubt" of defendant's competency to
waive his constitutional rights and plead to the
charge against him. That defendant's demeanor at
arraignment did not reveal any apparent abnormal-
ity cannot be relied upon to dispense with a hearing
on that very issue. *Pate* v. *Robinson, supra.* How-
ever, "[t]he sensitive and crucial aspect of the
present case is the imposition of sentence notwith-
standing notice of the prior psychiatric history of
the accused." *Hyatt* v. *United States* (D Colo 1963),
223 F Supp 594, 598.

The trial court responded to the presentence re-
port by stating, "I have a report here from the doc-
tors. They gave you a lot of tests, didn't they?
* * * They don't say that they can help." While
the trial court was concerned enough about defend-
ant's mental condition to include in the judgment
a recommendation for further psychiatric examina-
tion and treatment as indicated, he failed to heed
the warning couched in the report that defendant
may not have been criminally responsible for the
offense charged.

The report concluded that "it is not surprising,
after all the years of repression and frustration,
that the patient 'on impulse' took the opportunity
to violate a woman in the manner that he did." In
this state, a showing that an accused may have re-
sponded to an "irresistible impulse" is still con-
sidered relevant to a determination of criminal
responsibility. *People* v. *Krugman* (1966), 377 Mich
559; *People* v. *Cole* (1967), 8 Mich App 250. In
addition, defendant was diagnosed as suffering from

"sociopathic personality disturbance, sexual deviation, with features of very strong hostility." While there is a difference of opinion in the psychiatric profession whether a sociopathic personality disturbance is, or is not, a mental disease, some courts have held that it is. As stated in *Overholser* v. *O'Beirne* (1961), 112 US App DC 267 (302 F2d 852, 855):

"[The finding of the lower court] rests on the * * * conclusion that sociopathic personality disturbance is not a mental disease. Whether this theory is correct or not, it has been rejected by a majority of this court."

See *Blocker* v. *United States* (1959), 107 App DC 63 (274 F2d 572); (1961), 110 App DC 41 (288 F2d 853, 859–862), *cert. den.* (1963), 375 US 923 (84 S Ct 269, 11 L Ed 2d 167); *Overholser* v. *Leach* (1958), 103 App DC 289 (257 F2d 667), *cert. den.* (1959), 359 US 1013 (79 S Ct 1152, 3 L Ed 2d 1038). *Cf. Bell* v. *United States* (ND Miss, 1966), 265 F Supp 311.

Defendant here was eighteen years old with no prior criminal record. Without benefit of counsel, he pleaded guilty to an offense which carried a possible sentence of life imprisonment. He was undoubtedly unaware of the fact that he may have had a possible valid defense to the charge to which he was pleading guilty. Under the circumstances, the trial court erred in failing "to observe the unfurled flags signalling danger and possible or probable infirmity in the defendant's capacity or volition, or both." *United States* v. *Kincaid* (CA4, 1966), 362 F2d 939, 941.

The factual situation in the present case is similar to the one in *Hyatt* v. *United States, supra.* In *Hyatt,* the accused entered a plea of guilty after waiving his right to counsel. At the time of sentenc-

ing, the court was furnished a pre-sentence report
which revealed a history of personality disorder.

"There were several evaluations in the pre-sen-
tence report, all of which agreed that while the
petitioner was not psychotic, he had a sociopathic
personality disturbance. These reports also warned
that the petitioner was extremely dangerous being
unable to control his impulses, as shown by a long
history of violence." *Hyatt* v. *United States, supra,*
at 596.

Notwithstanding the report, the accused was sen-
tenced with a recommendation that he be given fur-
ther psychiatric examination and treatment as
indicated.

In ruling on defendant's motion to vacate sentence,
the court in *Hyatt* first considered whether, under
the circumstances, the trial court was justified in
sentencing the petitioner without first appointing
counsel.

"The important consideration here is that assign-
ment of counsel would not have been a mere gesture,
because there was a background of evidence from
which an argument, at least, could have been made
that the petitioner's mental condition rendered him
incompetent. That such an issue is under these cir-
cumstances cognizable is apparent from the decision
of the Supreme Court in *Massey* v. *Moore* (1954),
348 US 105, 75 S Ct 145, 99 L Ed 135. There the
defendant alleged that at his trial at which he was
not represented, he was insane. In holding that
such allegations demanded a hearing the Supreme
Court said: '* * * We cannot hold an insane man
tried without counsel to the requirement of tender-
ing the issue of his insanity at the trial. If he is
insane, his need of a lawyer to tender the defense
is too plain for argument. We have not allowed
convictions to stand if the accused stood trial with-
out benefit of counsel and yet was so unskilled, so

ignorant, or so mentally deficient as not to be able
to comprehend the legal issues involved in his de-
fense. See *Williams* v. *Kaiser* (1945), 323 US
471 (65 S Ct 363, 89 L Ed 398); *Wade* v. *Mayo*
(1948), 334 US 672 (68 S Ct 1270, 92 L Ed 1647);
*Palmer* v. *Ashe* (1951), 342 US 134 (72 S Ct 191,
96 L Ed 154). The requirement of the Fourteenth
Amendment is for a fair trial. See *Betts* v. *Brady*
(1942), 316 US 455, 462 (62 S Ct 1252, 1256, 86
L Ed 1595). No trial can be fair that leaves the
defense to a man who is insane, unaided by counsel,
and who by reason of his mental condition stands
helpless and alone before the court. Even the sane
layman may have difficulty discovering in a partic-
ular case the defenses which the law allows. See
*Gibbs* v. *Burke* (1949), 337 US 773 (69 S Ct
1247, 93 L Ed 1686). Yet problems difficult for him
are impossible for the insane. Any defense is hope-
lessly beyond reach for an accused who is insane.
He stands convicted on a charge which he could not
contest and yet for which he may well have had a
complete defense.' " *Hyatt* v. *United States, supra,*
at 596. *Cf. People* v. *Coates* (1957), 347 Mich 626.

In its order denying defendant's motions for new
trial and to withdraw his plea of guilty, the trial
court concluded that defendant fully understood his
constitutional rights and the nature of the charges
against him before he "freely and voluntarily
pleaded guilty." We do not agree.

"Here, as in *Moore* v. *Michigan* (1957), 355 US
155, 160 (78 S Ct 191, 2 L Ed 2d 167), 'The record
shows possible defenses which might reasonably
have been asserted at trial, but the extent of their
availability raised questions of considerable tech-
nical difficulty obviously beyond his [the defend-
ant's] capacity to comprehend.' " *People* v. *Whitsitt*
(1960), 359 Mich 656, 662.

As a consequence, the duty imposed on a trial
court in cases of this kind is greater than that which

was observed here. As stated in *Ruebush* v. *United States* (CA10, 1953), 206 F2d 810, 812, Judge Murrah dissenting:

"The trial court had actual knowledge from the probation report before it that the applicant was emotionally unstable and had been suffering from a mental infirmity. This alone was sufficient to give warning to the court of an unusual situation requiring special attention. In these circumstances, the duty of the court to vouchsafe the constitutional rights of the accused is not discharged by 'yes' and 'no' answers to formal questions. See *Snell* v. *United States* (CA10, 1949), 174 F2d 580."

The trial court should not have permitted defendant to plead guilty without the assistance of counsel.

" ' "The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." (*Johnson* v. *Zerbst* (1938), 304 US 458, 465 [58 S Ct 1019, 82 L Ed 1461, 146 ALR 357]; *Adams* v. *United States, ex rel. McCann* (1942), 317 US 269, 270 [63 S Ct 236, 87 L Ed 268, 143 ALR 435].) To discharge this duty properly in light of the strong presumption against waiver of the constitutional right to counsel (*Johnson* v. *Zerbst, supra*, 464; *Glasser* v. *United States* (1942), 315 US 60, 70 [62 S Ct 457, 86 L Ed 680]), a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such a waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of

allowable punishments thereunder, *possible defenses to the charges and circumstances in mitigation thereof,* and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered.' " *People* v. *Whitsitt* (1962), 366 Mich 609, 614, 615, quoting *Von Moltke* v. *Gillies* (1948), 332 US 708, 723, 724 (68 S Ct 316, 92 L Ed 309). (Emphasis supplied.)

Since defendant's rights could not have been fairly protected without the assistance of counsel, his right to counsel cannot be deemed to have been intelligently and understandingly waived. The error is one of substance and not one of form. *People* v. *Dunn* (1968), 380 Mich 693. Looking at the "totality of circumstances" (*People* v. *Whitsitt* [1960], 359 Mich 656, *supra*), we conclude that defendant's motion to withdraw his plea after conviction and sentence succeeded in showing a miscarriage of justice. *People* v. *Winegar* (1968), 380 Mich 719. This is one of those cases which directs itself to "the simple and fundamental proposition that 'I am not in fact guilty' ". *People* v. *Dunn, supra,* 701.

"It is unnecessary to conduct a factual hearing looking to a determination of whether the accused was in fact sane or insane at the time of the entry of the plea because the record is certain to show that there was evidence which would have been available to * * * counsel whereby the sanity of the accused at the time of the alleged commission of the offense could have been placed in issue." *Hyatt* v. *United States, supra,* at 598.

It is therefore ordered that the conviction, together with the sentence based thereon, be vacated

and that defendant, with the assistance of counsel, be rearraigned.

All concurred.